UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

**DEBORAH G. CULOTTA**             *         CIVIL DOCKET

VS                                              *         NO. 10-

**SODEXO REMOTE SITES PARTNERSHIP, formerly
UNIVERSAL SERVICES, UNIVERSAL OGDEN,
UNIVERSAL SERVICES, INC.,
and UNIVERSAL SODEXO**
                                                      *         SECTION " " (   )

* * * * * * * * * * * * * * * * *

**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF
THE EQUAL PAY ACT - 29 U.S.C. 206 (d)(1), THE AGE DISCRIMINATION IN
EMPLOYMENT ACT OF 1967, BREACH OF CONTRACT AND TORT**

Claimant complains of the defendants as follows:

**JURISDICTION**

1.    This Court has jurisdiction over Petitioner's various claims under the following

statutes:

a.    **Equal Pay Act - 29 U.S.C. 206(d)(1) (EPA)** - for the intentional and

discriminatory payment of a lower salary to plaintiff, a female, for the same

duties as her predecessor and successor;

b.    **Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. 621,

et seq.** - for the intentional discrimination against Plaintiff based on age in

the payment of salary, assignments, duties, work conditions and

emoluments;

c.    **Breach of Contract Under State Law** - for the intentional failure and

refusal to honor their agreement to pay Plaintiff on an equal basis with

male employees performing the same duties;

d.  **La. Civil Code 2315, et seq** - for intentional infliction of emotional distress in an effort to force Plaintiff to resign or retire;

e.  Under the **General Tort Law** of Louisiana

f.  This Court has pendent jurisdiction of Claimant's claims under the Louisiana Civil Code Article 2315 and General Louisiana Tort Law for intentional infliction of emotional distress and denial of due process, substantive and procedural.

## VENUE

Claimants and defendants reside in this District, and this action arose in this District.

## PARTIES

Plaintiff is a person of the full age of majority and domiciled within the jurisdictional territory of this Court;

Defendant Sodexo Remote Sites ("Sodexo") is a foreign corporation authorized to do and doing business within the jurisdictional territory of this Court.

## FACTS

1.  Plaintiff has been employed with Sodexo Remote Sites Partnership ("Sodexo") since May 10, 1983.

2.  Plaintiff has held various positions through her tenure with the company as "Sodexo" and with defendant through it's many company name changes.

3.  Defendant Sodexo was Universal Services, Universal Ogden, Universal Services, Inc., and Universal Sodexo, and is currently called "Sodexo Remote Sites" (short

name for "Sodexo Remote Sites Partnership"), a French owned company.

4. In April of 2004 Plaintiff held the position of Personnel Manager with Wayne Davis (HR Director) as her direct Supervisor.

5. At the end of April 2004, Wayne Davis was terminated for cause.

6. Plaintiff was informed by Sodexo's Sr. VP of the time, Bill Gabbey, that she would replace Wayne Davis as the HR Director.

7. Gabbey, as Sodexo's Sr. VP, promised Plaintiff the same compensation as Wayne Davis, but (contrary to the Equal Pay Act) that the increases would come in increments during the 3 month period following Plaintiff's promotion.

8. Wayne Davis, plaintiff predecessor, was earning $82.052.00 annually at the time of his termination.

9. On May 10, 2004 Plaintiff's salary increased from $41,186.00 to $50,000.

10. Plaintiff's second increase came in August 1, 2004, which brought Plaintiff's salary to $60,000.

11. Plaintiff received a car allowance of $400.00 on November 1, 2004. The car allowance was part of the HR Directors package, which Mr. Davis received as well.

12. On November 1, 2005, Plaintiff was increased to 65,000.

13. At the time of the November 1, 2005, increase to $65,000, still more than $17,052.00 less than her male predecessor, Plaintiff questioned Mr. Gabbey about the pay equal to Wayne Davis which she was promised.

14. Gabby then told Plaintiff that the Paris office did not approve the increase to the level of Plaintiff's predecessor, Wayne Davis.

15. In January 1, 2006, Plaintiff was increased to 70,000, still $12,052.00 less than her

predecessor, Wayne Davis.

16. Plaintiff's car allowance increased at this time, which brought her allowance to 600.00 per month.

17. Subsequent increases, which still did not bring Plaintiff to the level of her predecessor or successor, were as follows: January 1, 2007  increased to 72,450. January 1, 2008, earning 75,348.

18. During Plaintiff's time as HR Director at Sodexo,  an OFCCP Class action suit was filed against Sodexo.  OFCCP determined Sodexo was negligent in their hiring practices.

19.  These hiring practices were the same practices Sodexo used before Plaintiff  took over as HR director.

20. The class action suit was settled before Mr. Gabbey left as Sr. VP of Sodexo and before Marit Teigland, Gabbey's successor, was transferred to the United States from Norway to take over as Sr. VP.

21. Gabbey (Sr. VP) was terminated **without** cause in September of 2007.

22. Marit Teigland was brought in from Sodexo Norway to take over as Vice President.

23. During Plaintiff's first meeting with Teigland, Teigland told Plaintiff, without cause or reason, that she (Teigland) questioned whether Plaintiff  could be "loyal to her".

A. Plaintiff advised that she would be loyal to whoever held the position of VP.

24. During the next several months, for no valid reasons, Teigland claimed to be unhappy with  Plaintiff's performance.

25. In March '08 Plaintiff was "encouraged" by Marit Teigland and Aaron Condray, Int'l HR Director of Sodexo, to step down as HR Director.

26. Plaintiff was then told that Sodexo wanted to implement a "Training & Development Program", and Plaintiff was moved into the "Training & Development Director" position.  Her pay remained the same and, more importantly, her duties remained the same.

   a. Plaintiff was now performing Wayne Davis' duties but with a different title and for less than the pay received by Wayne Davis or her successor, Goodwine;

   b. Sodexo played a shell game to keep Plaintiff performing the HR job for less pay than Wayne Davis, her predecessor, or Goodwine, her successor;

   c. this was a bad faith effort by Sodexo to cheat Plaintiff out of the pay promised;

   d. this was an intentional act on the part of Sodexo to avoid the dictates of the Equal Pay Act, the Age Discrimination in Employment Act, and to try to avoid breach of contract.

27. Vince Goodwine was hired in July of 2008 as the "Sr. HR Director" at the salary of $130,000 plus.  This was Plaintiff's predecessor to the HR position, in spite of the added "Sr." to the title.

28. Shortly after Goodwine arrived, he and Plaintiff traveled to Lafayette to visit a new training facility Sodexo was considering.  On their trip back to the office, Vince asked Plaintiff: between Training & Development and Employee Relations, which position would Plaintiff like best.

29. Plaintiff advised that her heart was in Employee Relations since Plaintiff has always been in employee relations and has always been an advocate for the employee's, this was her passion.   Goodwine then agreed to and spoke to Teigland about the

role of Employee Relations.

30.    Teigland  approved the position and Plaintiff became the "Employee Relations Manager".

a.    Plaintiff was now performing Wayne Davis' duties but with a different title and for less than the pay received by Wayne Davis or her successor, Goodwine;

b.    Sodexo played a shell game to keep Plaintiff performing the HR job for less pay than Wayne Davis, her predecessor, or Goodwine, her successor;

c.    this was a bad faith effort by Sodexo to cheat Plaintiff out of the pay promised;

d.    this was an intentional act on the part of Sodexo to avoid the dictates of the Equal Pay Act, the Age Discrimination in Employment Act, and to try to avoid breach of contract.

31.    In the created position of "Employee Relations Manager", Plaintiff's  pay remained the same as did most of her responsibilities when she was HR Director.    Plaintiff was responsible for investigations, EEOC mediation, unemployment, Sodexo's monthly random Drug and Alcohol Program, problem solving and resolution.

32.    Plaintiff did not receive an increase since Sodexo, as pretext, considered her pay high for the position.

a.    Plaintiff is actually still doing the HR director's job with the new title off "Employee Relations Manager".

33.    During annual increases Plaintiff  received a" lump sum" in lieu of increases.  She received a 2% lump sum on January 1, 2010. (**Document "D"**)

34. Many changes continued to transpire in the HR department as Sodexo hired a new Training & Development Director, a Talent Acquisition Manager and a Comp & Ben. Manager.

   a. The HR department was growing rapidly.

35. Many positions changed throughout the company and Job descriptions were changed in order to bring in allegedly "more qualified" employees, however, Sodexo was actually eliminating older employees with younger employees and female employees with male employees.

   a. Sodexo has eliminated positions with employees in the "protected" class with a younger work force.

36. Subsequently, the new SR. HR Director, Vince Goodwine [$130,000.00 PER YEAR] was terminated for cause.

37. Todd Woodruff, Training & Development Director, was then promoted to Sr. HR Director in July of 2010, and receives the salary of $114,000.00.

38. A meeting between Woodruff, Teigland and Aaron Condray took place in Sodexo's Houston office near the end of July, 2010.

39. On Thursday, August 13th, Plaintiff asked Woodruff if she could speak with him. Woodruff scheduled the meeting three (3) different times and each time Woodruff reneged.

   a. At the end of the day Woodruff told Plaintiff they would meet @ 8:30 Friday morning, August 13, 2010.

40. On Friday morning, August 13, 2010, Plaintiff and Woodruff finally met.

a.    There were several issues Plaintiff needed to discuss with Woodruff, one being the Leadership Training that was scheduled for Wednesday, August 19th-20th.

b.    Plaintiff  was always a part of the training and gave presentations.

c.    This year Plaintiff was not included.

d.    Woodruff  said Teigland excluded her from the meeting since she, Teigland, was in charge deciding who would participate.

41.    Woodruff then asked Plaintiff  how she felt about how things were going with the "team".

a.    Plaintiff told him she didn't feel like she was part of the "team" anymore.

42.    Woodruff then proceeded to tell Plaintiff about the meeting he had the previous week in Houston, and how Plaintiff's  job was going to require her to be offshore 25% of the time.

a.    Woodruff stated that he wanted to know how Plaintiff felt about going offshore.

43.    As per earlier conversations and notice, Plaintiff advised Woodruff that she could not go offshore.

a.    Plaintiff stated to Woodruff: "*Todd I've told you many times how I fear the water and I would not be able to pass the Water Survival training, which is a requirement to go offshore.*"

44.    The change in duties, change in position and title with the same duties as the HR director, the sudden bogus need to go on the water, when Sodexo knows of Plaintiff's clinical fear of water, were all intentionally designed and executed, along

with other tactics, to cause Plaintiff harm, emotional distress, put her in positions to fail, use her to perform the HR director's duties without the HR director's salary as compared to her successor and predecessors, and to force plaintiff to retire based on age and gender.

45. Plaintiff asked Woodruff if she could visit the docks instead, meet with the crew going offshore and the ones coming in.

    a. Woodruff stated that he didn't know if Teigland would "go for this".

    b. Woodruff stated that Teigland and Aaron were pretty set on [plaintiff[ going offshore."

46. Woodruff then *asked Plaintiff when she was planning on retiring*. Plaintiff advised that she was only 58 yrs. old.

47. Woodruff then said, "oh then you need to be 59 ½."

48. Plaintiff then told Woodruff that she couldn't receive social security until she was 62.

49. Woodruff then suggested that Sodexo can have Plaintiff work on special projects for a year as did another employee named Monica Kindley.

    a. Monica was the Talent Acquisition Manager who Sodexo paid to relocate from her home in Orlando, Florida to Sodexo's Houston office.

50. Woodruff then stated: "This is really a shame. You've been with the company for so long".

51. Plaintiff then reminded Woodruff that she "*was never paid equal pay to Wayne Davis*."

52. Further, Plaintiff was never paid equal pay compared to her successor, Goodwine, who was paid $130,000.00 plus.

53. In July 2010, Woodruff came into Plaintiff's office and asked her if she knew when Cecil Klutz was going to retire.

    a.    Plaintiff advised that she didn't know.

54. Cecil Klutz is Sodexo's Risk Manager and is 65 yrs. Old.

55. Age has been a factor at Sodexo for quite some time.

    a.    While Plaintiff held the role of HR Director, Dennis Scherrer, *an executive manager,  referred to an older lady in his department as a "dinosaur"*.

    b.    Scherrer was an expat from Paris.

    c.    Plaintiff reported the incident to Aaron Condray, Int'l HR Director.

    d.    Condray wanted Sherrer to attend training but Sherrer refused.

    e.    Eventually, Sherrer was transferred back to Europe.

56. On March 12, 2010 Vince Goodwine asked for the birthdays for those in Plaintiff's department.

    a.    Plaintiff supplied him with the information he requested.

57. On another occasion, Sodexo was interviewing for a CFO.

    a.    Sodexo's  Payroll Manager, Gus Chen, turned in his resume for the job.

58. Nanno Wams (Paris office) came down to conduct interviews for the CFO.

    a.    Wams interviewed Gus Chen and inquired re his age.

59. Wams  told Plaintiff that Gus Chen was too old.

    a.    Gus Chen was in his 50's at the time.

    b.    Gus Chen is no longer with Sodexo.

60. On or about Feb. 4, 2009, Plaintiff received an e-mail from Sodexo's Comp & Ben Manager regarding "known life risk" for Sodexo's insurance company.

61. An examination of the employees fired, resigned, forced out or otherwise leaving since May 2009 shows birth years ranging from 1946 to 1962 (except for one born in 1970 who quit due to "working conditions").

   a. the new hires' birth years since May 2009 range from 1970 to 1985.

62. After Teigland arrived, she stated on many occasions "we were no longer "Universal"".

   a. Teigland stated that she would see to it that the Gulf of Mexico would now run like it did in the North Sea.

63. Approximately 6 to 8 months after Vince Goodwine, Plaintiff's successor, started working for Sodexo, his name was pulled for a random drug screen.

64. Random drug and alcohol screens in were held in Plaintiff's office once a month with an outside vendor.

65. IDD would come in give Plaintiff the list and Plaintiff would notify the employee that they had been chosen.

66. On this particular day Vince Goodwine was not supposed to be in the office. However, he did come in and walked right passed the area where the test where being conducted.

67. Plaintiff  waited a couple of minutes and then went to his office and informed him his name had been chosen.

68. Goodwine told Plaintiff:  "I am not here.  I am not going to do the test".

69. Plaintiff thought Goodwine was kidding at the time and walked away and waited for IDD to finish up with the other 5 employee's who had been chosen.

70. Plaintiff then went back to Goodwine's office and again told him he had been

chosen for the drug test.  Goodwine then stood up and yelled "I said I am not going to do the test.  I was not supposed to be here today" and slammed his door.

71.    Goodwine's paperwork was documented as refusing to submit to the drug test.

72.    Goodwine's refusal to submit to the drug test was a direct violation of Sodexo's Drug and Alcohol Policy and Goodwine was Plaintiff's supervisor.

73.    Plaintiff decided to call Troy Roussel, Sales & Marketing Director, who was in the Dominican Republic at the time.

74.    Troy told Plaintiff that she had to report Goodwine's refusal to be tested to Teigland, which Plaintiff already knew.   However, hearing it from Troy made Plaintiff feel better.

75.    As it turned out, Teigland was in the Dominican Republic with Troy.  So Troy asked her to give Plaintiff a call.

76.    When Teigland returned to the office she asked Plaintiff to go over the facts with her, which Plaintiff did.

77.    Teigland then called Aaron Condray in Paris and Plaintiff had a conversation with both of them, going over the same details of what transpired.

78.    Plaintiff spoke to both Aaron and Teigland a few times going over the same information.  They both agreed this was a very serious offense and a terminable one as well.

79.    A few days later, on Friday,  Vince Goodwine was called into Teigland's office. Vince Goodwine was not terminated for his infraction.

80.    Vince Goodwine returned to the office on Monday.

81.    Plaintiff was told by Teigland that Vince Goodwine would have to apologize to the

department.  He received no punishment for his infraction.

82.   Later on in the same week that Goodwine returned after refusing the drug test, Teigland held a meeting.

83.   At this meeting Teigland made a false excuse for Goodwine's failure to take the drug test by claiming that it is was a "lack of communication" and Vince Goodwine didn't know the test was being conducted.

84.   Teigland falsely told everyone Vince Goodwine was on an important phone call to the Dominican Republic when he was informed he needed to take the test.  This was totally false and Teigland's way of covering up for Goodwine.

85.   Subsequently, Vince Goodwine was terminated for inappropriate behavior in  the presence of a female employee in Sodexo's Houston office.

86.   After Goodwine's termination, Todd Woodruff talked to plaintiff about the meeting wherein Teigland lied to cover for Goodwine's failure to take the drug test.

87.   Woodruff stated that he was not aware that Vince Goodwine refused the test nor was anyone else in the department aware that he refused the test.

88.   Woodruff stated that Teigland "threw [Plaintiff] under the bus".

89.   During Plaintiff's entire time with the company, no employee has ever refused the drug test and not been fired.

90.   Barry Johnson was Sodexo's General Manager.

91.   Johnson worked very closely with Bill Gabbey while Gabbey was Sr. VP.

92.   On or about January 1, 2010, Sodexo hired a VP of Operations.

93.   Subsequently to the hiring of the VP of Operations, Barry Johnson was blamed for the  "Thyssen Krupp" project in Theodore, Alabama (referred to by the short name

of "TK Project"),   a project which was losing money.

94.    The TK Project was a land based job, which would bring in revenue in years to come once it was up and running.

95.    The TK Project was the first time Sodexo was going to be involved in a land based project of this nature.

96.    In or about March of 2010, a meeting took place between Dennis Pontiere, VP/Ops., Teigland, Barry Johnson and Johnson's entire team.

97.    After this meeting, Johnson told Plaintiff that he planned to turn in his notice (of resignation).

98.    Shortly thereafter, Johnson resigned.

99.    Eric Bay, Ops. Mgr., had the responsibility to oversee the TK Project in Alabama.

100.    Eric Bay resigned on or about April 30, 2010.

101.    In May, 2010, Bobby De Marco, Ops. Mgr.,  resigned.

102.    Both Eric Bay and Bobby DeMarco were denied severance packages.

103.    Talent Acquisition Specialist, Judy Nero, resigned from Sodexo on or about July 15, 2010.

104.    During Plaintiff's employment with Sodexo and it's predecessor companies, Plaintiff has worked with 7 HR Directors.

105.    Four (4) of these HR Directors were terminated for cause, one (1) resigned and is now working for a competitor, and another resigned to work in the Insurance business.

106.    On or about August 23, 2010, Todd Woodruff asked Plaintiff how she was doing since their last meeting.

107.  Woodruff asked Plaintiff if she had given any thought to "what she wanted to do."

108.  Plaintiff advised Woodruff that she already told him she could not go onto the water (offshore), and Plaintiff reminded him, again,  that she gave him notice of her problems with water long ago.

109.  Woodruff asked Plaintiff if her job description said she did not have to go offshore.

110.  Plaintiff advised Woodruff that she did not have a written job description.

111.  Plaintiff was then asked by Woodruff is she would take a "consultant" job for a year.

112.  Plaintiff advised that she would not take a consultant job for a year because in a year she would not have a job and would not be any better off than she was presently.

113.  Plaintiff  told Todd Woodruff that she has been treated unfairly and reminded Woodruff that she was never paid the same salary as Wayne Davis, which was promised in order to lure her into the job.

114.  Woodruff asked Plaintiff who promised her equal pay.  Plaintiff advised that it was Bill Gabbey, then senior VP.

115.  Plaintiff told Woodruff that her age was a factor for the following reasons:

   a.  she was asked when she was planning on retiring while attempting to be treated fairly and equally (in requesting pay equal to Wayne Davis, which was promised as enticement to get Plaintiff to take the job);

   b.  she reminded Woodruff that, just a few weeks prior,  he asked Plaintiff if she knew when Cecil Klutz was going to retire;

   c.  their conversation at that time had nothing to do with Cecil.

116.  Plaintiff advised Woodruff that Sodexo's CFO, Dennis Scherrer, referred to a

female employee (Sylvia Bates) as a "dinosaur" in front of witnesses.   This demonstrated Sodexo's problem with age.

117.   Woodruff continued to ask Plaintiff what she "wanted" in terms of retirement, or in terms of phasing her out.

118.   Plaintiff stated to Woodruff that she would like to leave with dignity.

119.   Woodruff stated that they (Sodexo) wanted to give Plaintiff a big retirement party.

120.   Plaintiff stated to Woodruff that she was not retiring, she was being forced out.

121.   Woodruff claimed that, because of Vince Goodwine, the HR dept. was "under a microscope", and that Sodexo wanted to make sure "we are in compliance".

122.   Plaintiff responded to Woodruff that this was an excuse, and that her performance has never been an issue.

123.   Defendant has pursued an intentional pattern and practice of forcing older and female employees out of their employment through

a.    intimidation,

b.    removal of duties,

c.    addition of duties beyond their "job descriptions" and ordinary duties that are designed to force them to resign,

d.    unwarranted criticism and blame,

e.    refusal to pay them equally with other employees based on age and gender,

f.    harassment based on age and gender,

g.    other illegal practices that will be revealed in discovery and shown at trial.

124.   Defendant has intentionally instituted the above  practices, and more, against Plaintiff in order to force her to resign because of her age and gender.

125. Defendant has refused to pay Plaintiff equally as compared to her predecessor, Wayne Davis ($82,000 plus annually) or her successor (Vince Goodwine, $130,000 plus annually) because of her gender and age.

126. Defendant has further harassed petition by creating a hostile work environment, by removing her duties and removing her from decision making meetings in which she participated before Sodexo decided to force her out and pay her unequally because of her age and gender.

## COUNT I

127. Petitioner reiterates, re-alleges and incorporates allegations of previous and subsequent paragraphs.

128. By committing the intentional and negligent acts complained of, defendants have violated petitioner's rights under The EQUAL PAY ACT, 29 U.S.C. 206(d)(1), as amended.

129. This and other violations have caused petitioner loss of pay, loss of benefits, great emotional, mental, psychological and physical harm, loss of income, loss of family and loss of enjoyment of life, for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

## COUNT II

130. Petitioner reiterates, realleges and incorporates allegations of previous and subsequent paragraphs.

131. By committing the intentional and negligent acts and omissions complained of, defendants have violated petitioner's rights under the Age Discrimination in Employment Act of 1967 (ADEA) .

132. This and other violations have caused petitioner loss of income and benefits, great emotional, mental, psychological and physical harm, loss of income, loss of family and loss of enjoyment of life, for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

## COUNT III

133. Petitioner reiterates, realleges and incorporates allegations of previous and subsequent paragraphs.

134. By committing the intentional acts complained of, defendants have breached their contract of employment with Plaintiff, particularly but not limited to, their promise to pay Plaintiff equally as compared to Wayne Davis.

135. This and other violations have caused petitioner loss of income and benefits, great emotional, mental, psychological and physical harm, loss of income, loss of family and loss of enjoyment of life, for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

## COUNT IV

136. Petitioner reiterates, re-alleges and incorporates allegations of previous and subsequent paragraphs.

137. By committing the intentional acts complained of, defendants have violated petitioner's rights under La. Civil Code 2315 via intentional infliction of emotional distress.

138. Defendant's actions are far beyond the pale of what is expected in a civilized society, and defendant has intentionally inflicted said emotional distress as a way of forcing Plaintiff and others to resign or retire.

139. This and other violations have caused petitioner great emotional, mental, psychological and physical harm, loss of income, loss of family and loss of enjoyment of life, for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

**COUNT V**

140. Petitioner reiterates, re-alleges and incorporates allegations of previous and subsequent paragraphs.

141. By committing the intentional acts complained of, defendants have violated petitioner's rights under the General Tort Law of Louisiana.

142. This and other violations have caused petitioner great emotional, mental, psychological and physical harm, loss of income, loss of family and loss of enjoyment of life, for which defendants are liable in compensatory, punitive, exemplary, legal, equitable, nominal and all other damages that this Court deems necessary and proper.

WHEREFORE, petitioner, DEBORAH G. CULOTTA, prays that, after due proceedings, there be judgment in her favor and against defendant SODEXO REMOTE

SITES PARTNERSHIP for compensatory, punitive, exemplary, general, legal, equitable,

nominal, and all other damages that this Court deems necessary and proper.

Respectfully Submitted:

_____s/_____
John-Michael Lawrence (8143)
John-Michael Lawrence, LLC
Energy Center - Suite 2900 - PMB 204
1100 Poydras Street
New Orleans, La. 70163-2900
(504) 585-7797 tel
(225) 744-8748 fax
JMLaw122@cox.net